# Richmond

## THE PROVIDENT RELIEF ASSOCIATION v. JUNIUS BUTTS.

March 24, 1932.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*A. A. Bangel,* for the plaintiff in error.

*I. N. Wilson,* for the defendant in error.

CAMPBELL, C. J., delivered the opinion of the court.

This action was brought by Junius Butts, alleged beneficiary, to recover of the plaintiff in error, defendant in the trial court, the amount of an insurance policy issued on the life of one Lillian Smith. There was a verdict for the plaintiff, judgment was entered thereon by the court, and we are asked to review that judgment.

The written application was made by Butts, signed by him, and recites the relationship of the insured and Butts as that of cousin. The recital in the application on which the policy was issued is conceded to be false. It appears that for a number of years Butts and Lillian Smith had been living in a state of illicit cohabitation. At the time of the application they had separated, and Butts testified on the trial that she was indebted to him in the sum of $800.00, and that he also held two other policies on her life. The day after her death Butts presented the policy to the defendant and demanded payment therefor, which was refused.

The notice of motion merely sets forth that Lillian Smith was insured by the defendant in the sum of $500.00, and that plaintiff was named as beneficiary in the policy. In explanation of the recital in the application, plaintiff, on cross-examination, stated that he informed defendant's agent that Lillian Smith was his "woman;" that he did not inform him that she was his cousin; that though he could read, he did not read either the application or the policy. The proof further shows that Butts was a frequent violator of the law, having been convicted of various offenses at least eighteen times.

The agent of the company testified that Butts stated the relationship as that of cousin.  Two other applications for insurance on the life of Lillian Smith in other companies, signed by Butts, recited the relationship as that of cousin.

Plaintiff bases his right of recovery on two grounds:  (a) That the answers given were true; (b) that he was a creditor of Lillian Smith.  In our opinion he is not entitled to recover on either ground.

The case made out by plaintiff appears in his examination in chief, and is quoted at length as follows:

"Q.  Your name is Junius Butts?

"A.  Yes, sir.

"Q.  Where do you live?

"A.  I live 322 Cumberland street.

"Q.  Do you know Lillian Smith?

"A.  Yes, sir.

"Q.  What relation, if any, was she to you?

"A.  None at all.

"Q.  What?

"A.  No way related at all.

"Q.  It appears here on the 16th of September, 1922, you had one Lillian Smith insured in the Provident Relief Association in the sum of $500.00.  Is this true?

"A.  Yes, sir.

"Q.  Will you please state the circumstances under which you had her insured?

"A.  Lillian Smith and I were living together as man and wife.  And I left her to my house just like a man would leave his woman or wife, and went off and went to Washington, and I got in trouble in Washington and the judge gave me 360 days, but, by being a good prisoner, he let me out with 300 days.  And when I got out I come back to Norfolk. And when I come back to Norfolk I didn't have no house at all.  She was not there.  She was living somewhere else renting a little room.  And I went to find her, and I asked

about my furniture and clothes and everything and all was gone. And she gave me certain excuses, and this and that. She said she pawned the furniture to the Empire, if I am not mistaken.

"Mr. Bangel: We object to that.

"The court: We are interested in the insurance.

"A. (Continued.) And she pawned the furniture to the Empire.

"By the court:

"Q. We don't care about the furniture. Anything she owed you, tell about that.

"A. After all my furniture was gone and I asked her from time to time. I would not live with her any more, and I asked her from time to time what she was going to do. She said it wasn't nothing for her to do. And I heard about her and heard she had some money but it was not as much as I thought it was. I went and asked her about some money on the things.

"Mr. Bangel: We object.

"By the court:

"Q. Tell the jury if she owed you any more?

"A. Yes, sir.

"Q. Well, tell them that.

"A. She owed me around between $800.00 and $900.00, what I valued my furniture and she made way with it. And from time to time I went to her and I says to her, 'what are you going to do about my money?' She says, 'ain't nothing I can do about it.'

"By the court:

"Q. Junius, I have told you ten times not to tell any conversations.

"A. Yes, sir.

"By Mr. Wilson:

"Q. I will ask you about insurance. Did you and the girl have any discussion prior to the issuance of that policy?

A. Yes, sir. Her sister and I had discussed the insurance but not that particular one. I asked her could I insure her.

"Mr. Bangel: I object to what her sister said.

"By the court:

"Q. You have already told the jury that she was indebted to you. That is all they are interested in. They do not care anything about conversations between you and her.

"A. And I asked her could I take insurance on her to protect my. And she said yes. And I issued insurance with this company.

"By Mr. Wilson:

"Q. Was anybody present at the time?

"A. When I took the insurance?

"Q. No, when you had the conversation with her.

"A. With her sister?

"Q. Is her sister in the court room?

"A. Yes, sir.

"Q. And there was a witness present at the time you and the woman had the conversation about the insurance?

"A. Yes, sir; her sister.

"Q. Did she consent to you insuring her?

"A. Yes, sir.

"Q. All right. Answer Mr. Bangel's questions."

In the face of the recitals in the applications and policy, that the relationship was that of cousin, the testimony of plaintiff throws very little light on the question. But let us assume that plaintiff revealed the true situation to the agent, and that the agent, in his zeal to obtain business, perpetrated a fraud upon his principal. Is the principal bound by the fraudulent act of the agent? We think not.

In *Royal Insurance Company* v. *Poole*, 148 Va. 363, 138 S. E. 487, 489, Judge Chichester approves the doctrine stated by Mr. Justice Field in *New York Life Insurance Co.* v. *Fletcher*, 117 U. S. 519, 6 S. Ct. 837, 29 L. Ed. 934. There we read: "Mr. Justice Field, speaking for the court, said:

" 'It is conceded that the statements and representations contained in the answers, as written, of the assured, to the questions propounded to him in his application, respecting his past and present health, were material to the risk to be assumed by the company, and that the insurance was made upon the faith of them, and upon his agreement accompanying them that, if they were. false in any respect, the policy to be issued upon them should be void. It is sought to meet and overcome the force of this conceded fact by proof that he never made the statements and representations to which his name is signed; that he truthfully answered those questions; that false answers written by an agent of the company were inserted in place of those actually given, and were forwarded with the application to the home office; and it is contended that, such proof being made, the plaintiff is not estopped from recovering.'

"And then the court proceeds to wipe aside this contention as follows:

" 'But on the assumption that the fact as to the answers was as stated, and that no further obligation rested upon the assured in connection with the policy, it is not easy to perceive how the company can be precluded from setting up their falsity, or how any rights upon the policy ever accrued to him. It is, of course, not necessary to argue that the agent had no authority from the company to falsify the answers, or that the assured could acquire no right by virtue of his falsified answers. Both he and the company were deceived by the fraudulent conduct of the agent. The assured was placed in the position of making false representations in order to secure a valuable contract which, upon a truthful report of his condition, could not have been obtained. By them the company was imposed upon and induced to enter into the contract. In such a case, assuming that both parties acted in good faith, justice would require that the contract be canceled and the premiums returned.

As the present action is not for such cancellation, the only recovery which the plaintiff could properly have upon the facts he asserts, taken in connection with the limitation upon the powers of the agent, is for the amount of the premiums paid, and to that only would he be entitled by virtue of the statute of Missouri.

" 'But the case as presented by the record is by no means as favorable to him as we have assumed.' (And all that follows is equally true in the instant case.) 'It was his duty to read the application he signed. He knew that upon it the policy would be issued, if issued at all. It would introduce great uncertainty in all business transactions if a party making written proposals for a contract, with representations to induce its execution, should be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail; and there is no reason why it should be applied merely to contracts of insurance. There is nothing in their nature, which distinguishes them in this particular from others. But here the right is asserted to prove, not only that the assured did not make the statements contained in his answers, but that he never read the application, and to recover upon a contract obtained by representations admitted to be false, just as though they were true. If he had read even the printed lines of his application, he would have seen that it stipulated that the rights of the company could in no respect be affected by his verbal statements, or by those of its agents, unless the same were reduced to writing and forwarded with his application to the home office. The company, like any other principal, could limit the authority of its agents, and thus bind all parties dealing with them with knowledge of the limitation. It must be presumed that he read the application, and was cognizant of the limitations therein expressed.' "

The *Poole Case, Ryan* v. *World Mutual Life Insurance Co.*, 41 Conn. 168, 19 Am. Rep. 490, is also cited with approval as authority for the propositions that an insurer is not bound by the fraudulent act of the agent, expecially when it was within the power of the insured to discover the fraud by an examination of the application. The language relied on is as follows:

"But it cannot be supposed that these defendants intended to clothe this agent with authority to perpetrate a fraud upon themselves. That he deliberately intended to defraud them is manifest. He well knew that if correct answers were given no policy would issue. Prompted by some motive he sought to obtain a policy by means of false answers. His duty required him not only to write the answers truly as given by the applicant, but also to communicate to his principal any other fact material to the risk which might come to his knowledge from any other source. His conduct, in this case, was a gross violation of duty, in fraud of his principal, and in the interest of the other party. To hold the principal responsible for his acts, and assist in the consummation of the fraud would be monstrous injustice. When an agent is apparently acting for his principal, but is really acting for himself, or third persons, and against his principal, there is no agency in respect to that transaction, at least as between the agent himself or the person for whom he is really acting and the principal  *  *  *  . The fraud could not be perpetrated by the agent alone. The aid of the plaintiff, or the insured, either as an accomplice or as an instrument, was essential. If she was an accomplice, then she participated in the fraud, and the case falls within the principle of *Lewis* v. *Phoenix Mutual Life Ins. Co.*, 39 Conn. 100. If she was an instrument, she was so because of her own negligence, and that is equally a bar to her right to recover. She says that she and her husband signed the application without reading it and without its being read to them. That of itself was inexcusable negligence.  *  *"

But it is contended by plaintiff that in *Modern Woodmen of America* v. *Lawson*, 110 Va. 81, 65 S. E. 509, 511, 135 Am. St. Rep. 927, this court has stated a contrary doctrine. That case merely holds that "* * * an applicant for insurance has a right to depend upon the superior knowledge of the agent, and, in the absence of notice of limitations upon his powers, to assume that his authority is commensurate with the nature of the employment, and in good faith to act upon the information imparted by the agent, and to follow his instructions in all matters pertaining to the preparation of the application." In no sense is it authority for the doctrine that the principal is estopped from relying on the fraud of the agent when the fraud practiced was unknown to the principal.

At the conclusion of the evidence, over the objection of the defendant, this instruction was given to the jury: "The court instructs the jury that a creditor has an insurable interest in the life of his debtor."

As an abstract proposition of law, the instruction is perfect, but it has no application to the case at bar. Neither in the application, the policy of insurance, the notice of motion, nor in the evidence of the plaintiff, is it shown or claimed that the defendant was apprised of the alleged fact that Lillian Smith was indebted to plaintiff when the policy was issued. No claim is made by plaintiff that he informed the agent that insured was indebted to him. There is not a scintilla of evidence in the record that plaintiff informed the agent of the alleged relationship of creditor and debtor, and requested a policy of insurance based on such an insurable interest. The only intimation in the record that such a relationship existed is to be found in the evidence of plaintiff on the trial, that Lillian Smith was indebted to him in the sum of $800.00, and that he secured her consent to take out the policy. The instruction injected an issue raised by neither the pleadings nor the proof. It seems to

us more than probable that the jury were misled by the instruction, and that their verdict was based on an issue not involved in the case.

The judgment of the trial court will be reversed, and judgment entered in this court for the plaintiff in error.

*Reversed.*